## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**WINTER ENTERPRISES, LLC,**

      **Plaintiff,**

          **v.**

**WEST BEND MUTUAL
INSURANCE CO.,**

      **Defendant.**

      **Case No. 1:17-cv-360
JUDGE DOUGLAS R. COLE**

### OPINION AND ORDER

This cause comes before the Court on Defendant's Motion For Summary Judgment on Winter's Second Amended Complaint (Doc. 147), Defendant's Motion For Summary Judgment on its counterclaim (Doc. 148), Plaintiff's Motion For Partial Summary Judgment on West Bend's Counterclaim (Doc. 146), and Defendant's Motion to Exclude the Expert Report of Fuhrmann (Doc. 160). For the reasons stated more fully below, the Court **GRANTS IN PART** West Bend's Motion for Summary Judgment on Winter's Second Amended Complaint (Doc. 147). In particular, the Court finds that Defendant is entitled to judgment as a matter of law on Winter's breach of contract claim (Count One) and bad faith claim (Count Three). The Court therefore **DENIES** that same Motion **AS MOOT** to the extent that it seeks summary judgment on Winter's declaratory judgment claim (Count Two). The Court also **DENIES AS MOOT** Winter's Motion for Partial Summary Judgment on West Bend's Counterclaim (Doc. 146), West Bend's Cross-Motion for Summary Judgment on that

same counterclaim (Doc. 148), and West Bend's Motion to Exclude Fuhrmann (Doc. 160).

## BACKGROUND

### A. Winter Purchased Commercial Property Insurance From West Bend Mutual Insurance.

Scott Winter[1] is the sole owner of Plaintiff Winter Enterprises, an LLC organized under Ohio law. (Scott Winter Dep., Doc. 66-1, #1754). Winter Enterprises ("Winter") owned a commercial building located at 1631 Sherman Avenue, Norwood, Ohio, which it used to operate "Fun Factory," a roller rink and entertainment venue. (*Id*.). In 2016, Winter purchased a commercial property insurance policy for the roller rink from West Bend Mutual Insurance ("West Bend"). (Ins. Pol'y, Doc. 10-1, #71, 73).

In that policy, which is the policy at issue here, West Bend agreed: (1) to insure Winter's building on Sherman for up to $4,000,400; (2) to insure the personal property that belonged to Winter inside the building up to $250,000; and (3) to cover business income lost as a result of a coverable event for up to twelve months. (*Id*. at #90). A "building" is defined in the policy to include not only the physical structure, but also completed additions, fixtures, permanently-installed equipment and "personal property … used to … service the building … including … floor coverings." (*Id*. at #96). "Business Personal Property" is also a defined term. It includes "[f]urniture" and "[s]tock" as well as "[m]achinery and equipment." (*Id*.).

---

[1] Mr. Winter's full name is Wayne Scott Winter, but he goes by Scott Winter. (Scott Winter Dep., Doc. 66-1, #1752). Because Scott Winter's last name is the same as the name of the business entity that he owns, in the interest of clarity, the Court will refer to him as "Scott" and the business entity as "Winter."

The policy covers "direct physical loss" to any of this property. (*Id.* at #123). This coverage, however, is subject to a number of exclusions and conditions. The "exclusions" limit the types of loss or damage covered under the policy. As relevant here, the policy does not cover "loss or damage caused directly or indirectly by … surface water … whether driven by wind or not … [or by] [w]ater under the ground surface pressing on … foundations, walls, [or] floors." (*Id.* at #123–24). West Bend will not cover any loss caused in whole or in part by such water. To use the policy language, "[s]uch loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss." (*Id.* at #123).

Even when a coverable event causes loss or damage, the insured must comply with several duties, or "conditions," before the insured can collect under the policy. The policy, for example, requires the policyholder to "[s]end [West Bend] a signed, sworn proof of loss containing the information [West Bend] request[s] to investigate the claim … within 60 days after [West Bend's] request." (*Id.* at #105). The policy further requires the insured to "[c]ooperate with [West Bend] in the investigation or settlement of the claim." (*Id.*). Notably, the policyholder can forfeit coverage under the policy if he "intentionally conceal[s] or misrepresent[s] a material fact concerning" the covered property, his interest in the covered property, or the insurance claim. (*Id.* at #120).

If a policyholder satisfies these duties with respect to a covered loss, West Bend will pay the policyholder the "replacement value," which the parties refer to as the "RCV," i.e., the amount it would cost Winter to repair the damaged property to brand-

new condition. (*Id.* at #109). That said, the policy provides that West Bend will not pay the replacement value "[u]ntil the lost or damaged property is actually repaired or replaced" and "[u]nless the repairs or replacement are made as soon as reasonably possible after the loss or damage." (*Id.*). In the event that the policyholder does not make the repairs, West Bend instead pays the actual cost value, or "ACV," which is calculated by reducing the RCV to account for any depreciation of the damaged structure at the time the incident occurred. So, for example, if a roof has a useful lifetime of twenty years, and an insurable event causes damages that will cost $100,000 to repair at a point fifteen years into that useful lifetime, the ACV would be the remaining useful lifetime (i.e., five years in this example) divided by the total useful lifetime (here, twenty years) times the repair amount. Stated mathematically, the ACV would be: 5/20 x $100,000 = $25,000.

The policy took effect on April 23, 2016, and expired on April 23, 2017. (*Id.* at #70).

## B.   Winter Files An Insurance Claim For Storm Damages To The Roller Rink And West Bend Partially Denies That Claim.

On Sunday August 28, 2016, Xavier Cobb, the manager of the Fun Factory roller rink, had left for the day when he received a call from the session manager on duty. There had been a heavy rainstorm in the area after Cobb left. The session manager told Cobb that the whole roller rink complex had sustained severe water damage. (Cobb Dep., Doc. 61-1, #1666–67). Cobb, in turn, called Scott Winter ("Scott") to let him know about the circumstances. (Scott Winter Dep., Doc. 66-1, #1759). Originally, Scott was not overly concerned. That changed quickly once Cobb sent

4

Scott a photograph of the inside of the building showing a pool of water 10–18 inches deep across much of the skating rink. (*Id.*). Scott immediately dropped what he was doing and drove to the roller rink. He discovered that the building was in shambles. The garage door was "flapping in the air," water was "shooting out of the building," there were "skates in the parking lot," and "the parking lot had buckled up." (*Id.*).

When Scott entered the building, he saw that Cobb's picture had accurately depicted the state of affairs—the skate floor was underwater. (*Id.*). Scott then began to explore the rest of the building to try to locate the source of the water. (*Id.*). Scott "followed the water entering under the double door at the southeast rear corner that leads into the rear storage area." (Fuhrmann Dep., Doc. 140-1, #7493). Eventually, Scott found that both the roof in the "back room" and a wall near the alleyway had completely collapsed. (Scott Winter Dep., Doc. 66-1, #1759). Scott also discovered a large tree laying inside the building near the collapsed wall. (*Id.* at #1762).

Scott reported the damage to West Bend the next day, on August 29, 2016. (Claim Activity Log, Doc. 90-6, #2753). West Bend assigned the claim to senior claims representative Cathy Lanier. After reviewing the claim, Lanier called Code Blue, a water mitigation service which often works with West Bend, and alerted the company that someone from Winter might contact Code Blue regarding the Fun Factory site. (*Id.* at #2754; Lanier Dep., Doc. 90-1, #2617). Lanier also called Scott. During that call, Scott explained the extent of the damage to Lanier who, in turn, advised Scott of West Bend's procedures. (Lanier Dep., Doc. 90-1, #2599). In accordance with those procedures, Lanier then assigned Mike Fannon, an independent claims adjuster from

Syndicate Claims, to go to the site and verify the loss. (*Id.* at #2605). Meanwhile, Winter hired Mark Jacoby, a public claims adjuster from Metro Adjusting, to investigate the claim on Winter's behalf and to represent the company in its dealings with West Bend. (Jacoby Dep., Doc. 68-1, #2063).

The two adjusters met several times to survey the damage together. They reached at least some agreement regarding the collapsed roof. Both concluded that a clogged drain on the roof caused water to pool, and that the weight of the pooled water caused the roof to collapse. (*Id.* at #2064; Fannon Dep., Doc. 91-1, #2999).

The two adjusters, however, disagreed as to the reason for the collapse of the wall near the alleyway. Winter's adjuster, Jacoby, concluded that "wind drove a tree into a C block wall causing it to collapse and allowing water to enter the building." (Jacoby Dep., 68-1, #2064). Fannon, in contrast, concluded that the "excessive amount of rain in a short period of time" caused a "rush of water," including from a nearby sports field located uphill from the south wall of the building, which collected against and, eventually, collapsed, the masonry wall. (Fannon Report, Doc. 90-7, #2769).

On August 29, 2016, the day after the rainstorm, Fannon sent a report to West Bend detailing the results of his initial inspection. This report included Fannon's finding that surface water had caused the collapse of the back wall. (*Id.*). In addition to his report, Fannon called Lanier at West Bend and recommended that, in light of the severe structural damage and the disagreement between the two adjusters as to the reason the wall collapsed, an engineer should come out to examine the damage.

(Fannon Dep., Doc. 91-1, #3007). Lanier gave Fannon the green light to hire an engineer. (*Id.*).

On August 30, 2016, Lanier called Winter and advised him that West Bend's initial conclusion was that a large portion of the damage would not be covered because of the "surface water" exclusion in Winter's insurance policy. (Lanier Dep., Doc. 90-1, #2652). Lanier also called Code Blue and told the company to close its file on Winter's case because West Bend would not cover any flood damage.[2] (*Id.* at #2653).

Fannon subsequently engaged Patrick Slattery, a civil engineer with EES Group. (Fannon Dep., Doc. 91-1, #3014; Slattery Dep., Doc. 92-1, #3395). On September 6, 2016, Slattery made the trip out to the roller rink and walked the property with Scott. Scott says that, during this visit, Slattery stated that he believed the tree was responsible for the collapse of the wall. (Scott Winter Dep., Doc. 66-1, #1775). On September 15, 2016, however, Slattery sent Fannon a report indicating that "an impact from a fallen tree limb most likely did not initiate the collapse[] of the south … wall at the subject building." (Slattery Report, Doc. 92-2, #3508). Rather, Slattery concluded that "[t]he collapse of the south … wall … most likely was caused by relatively fast moving surface water carrying debris (i.e. flood waters) travelling in a north/northwesterly direction impacting the base of the wall." (*Id.* at #3510). As

---

[2] On August 29, 2016 at 10:38 a.m., Code Blue called Winter, who put Jacoby, Winter's public adjuster, on the phone. Jacoby then stated that Winter was declining Code Blue's services at that time. (Code Blue Log Notes, Doc. 145-3, #8030). At 1:46 p.m. that same day, Code Blue called Jacoby, who indicated that Winter had hired another restoration company. (*Id.*). Finally, at 2:27 p.m., Jacoby called Code Blue and stated that Winter did not want Code Blue to do any work until West Bend confirmed that it was covering the claim. (*Id.*). Therefore, Winter did not end up using Code Blue's services to mitigate the water damages.

for the damage to the roof, Slattery found that "the clogged western drain," "heavy amount of precipitation" and "deteriorated (i.e. rusted)" steel bar joists all contributed to the partial roof collapse. (*Id.*).

Meanwhile, Winter hired Richard Graman, an engineer from GEI engineering, to examine the collapsed wall. After an on-site inspection on September 2, 2016, Graman concluded that, while "[t]he relatively small force of the wind and/or water were likely acting on the wall," the "large force of the tree impact[ing] the wall … caused the collapse." (Graman Report, Doc. 66-2, #1809; Graman Dep., Doc. 98-1, #4812–13). Jacoby forwarded Graman's report to West Bend on October 4, 2016. (10/04/16 email to West Bend, Doc. 66-2, #1803). That same day, Lanier emailed Graman's report to Slattery, requesting that Slattery respond to Graman's findings. (Claim Activity Log, Doc. 90-6, #2758; *see also* 10/04/16 email to Slattery, Doc. 66-2, #1820).

On October 5, 2016, Lanier sent Winter and Jacoby a letter formally notifying them that while "the policy would provide coverage … for [the] roof collapse," West Bend will not "respond and pay for the damages resulting from the collapsed south wall and resulting flood water damages to the building." (Denial Letter, Doc. 66-2, #1818–19). In response, Jacoby sent an email asserting that, because Lanier issued a denial within 24 hours after receiving Graman's report, she did not properly consider the report and, instead, had her "mind made up" about coverage of Winter's claim. (10/05/16 email to Lanier, Doc. 66-2, #1823).

At that point, Lanier indicated that she had received and read Graman's report but, as she is not an engineer, she forwarded the report onto Slattery for review. (*Id.* at #1822). Lanier advised Jacoby that "[i]f Mr. Slattery would concur with the GEI report … we would reverse the denial." (*Id.*). Slattery reviewed Graman's report and determined that "[Graman was] incorrect in [his] conclusion" that the tree caused the wall collapse. (Slattery Dep., Doc. 92-1, #3426; Slattery Resp. to GEI, Doc. 92-3, #3568–74). Accordingly, Lanier stood by her decision not to cover the damage related to the collapsed wall.

Meanwhile, Winter and West Bend worked on settling the insurance claim concerning the damage to the roof. On September 28, 2016, Winter engaged Craig Johnson from Deer Park Roofing to survey the damage to the roof. (09/28/16 email to Johnson, Doc. 137-2, #7072). Johnston conducted a roof evaluation where he took several "core cuts" from the roof to determine the condition of the existing roof system. (Deer Park Report, Doc. 137-5, #7365). The core cuts revealed that there was moisture between the roof plies and in the wood fiber recovery boards. (*Id.* at #7366). Deer Park also observed "an area of collapsed deck with the recent storms, which has allowed water intrusion into the building and under the membrane as well as wind damaged surface plies." (*Id.*). Therefore, Deer Park concluded, Winter should remove and replace the entire roof system. (*Id.*).

West Bend asked Slattery from EES Engineering to respond to this Deer Park report. (Claim Activity Log, Doc. 90-6, #2762). Slattery found that "[t]he reported damage to the wood fibered insulation … most likely was not attributable to water

intrusion at the collapse." (EES Response to Deer Park, Doc. 92-3, #3578). Rather, the "condition of the wood fibered insulation is indicative of historic water intrusion and long-term degradation rather than water impact from a one-time event (i.e. collapse)." (*Id.* at #3578–79). Thus, Slattery concluded, the "direct physical damage to the roof system attributable to the August 28, 2016 loss most likely was limited to the collapse area as well as the localized area at the wind-damaged … surface plies in the south central portion of the roof." (*Id.* at #3579). In contrast, Slattery noted that "[t]he moisture and deterioration to the remainder of this roof section most likely were not related to this loss." (*Id.*).

Throughout November and December, Jacoby told Lanier that it was Winter's stance that "the roof system should be replaced in its entirety." (Claim Activity Log, Doc. 90-6, #2763–64). Lanier, however, conveyed West Bend's position that, because EES determined that much of the roof damage was due to pre-existing water infiltration, West Bend owes only for damage associated with the "collapse and [the] area where tree limbs caused punctures" in the roof. (*Id.*). West Bend ultimately paid Winter $158,055.93 in actual cash value (ACV) for the "covered" portions of the roof repair. (Lanier Dep. 2, Doc. 143-1, #7936; Claim Activity Log, Doc. 90-6, #2759).

Inclusive of this $158,055.93 payment, West Bend paid Winter a total of $410,242.94 on its claim. (Winter Enter. Resp. to West Bend's First Set of Interrog., Doc. 67-2, #2010). That $410,242.94 included eight separate payments for various forms of damages. These included, for example, two checks just north of $20,000 for lost business income and an $82,377.03 payment for damaged business personal

10

property.[3] (*Id.*; Lanier Dep. 2, Doc. 143-1, #7941–43). Those payments did not satisfy Winter, though, which, on March 1, 2017, filed two sworn proofs of loss: one claiming $1,034,890.42 in unpaid damages resulting from the collapse of the south wall; and one claiming $180,387.15 in unpaid damages for the collapse of the roof. (Proofs of Loss, Doc. 145-7, #8042–43).

Winter sold the building for $250,000 on February 26, 2020, without making any restorations or repairs. (Contract to Purchase, Doc. 145-1, #8018–23).

## C. Winter Sues West Bend, West Bend Files A Counterclaim, And Both Parties Move For Summary Judgment.

On April 27, 2017, Winter sued West Bend in the Hamilton County Court of Common Pleas. Winter's original complaint alleged five counts: (1) Breach of Contract; (2) Contractual Breach of the Implied Covenant of Good Faith and Fair Dealing; (3) Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing; (4) Bad Faith; and (5) Unfair Trade Practices. (Compl., Doc. 2, #17–20). West Bend removed the case to this Court on May 25, 2017, on diversity grounds. (Notice of Removal, Doc. 1). Winter has since amended the complaint twice.[4] The current version, which is Winter's Second Amended Complaint, alleges that West Bend (1) breached the contract when it denied some of Winter's claims (Count One); and (2) acted in bad faith because it partially denied Winter's claim within 24 hours of

---

[3] The eight checks were payments for (1) $82,377.03; (2) $23,169.00; (3) $4,146.70; (4) $22,140.00; (5) $85,402.28; (6) $158,055.93; (7) $17,002.00; and (8) $17,950.00. (Winter Enter. Resp. to West Bend's First Set of Interrog., Doc. 67-2, #2010).

[4] In between the time that Winter filed the original complaint and the second amended complaint, West Bend moved to dismiss all of Winter's claims except for his breach of contract claims. (Doc. 9). The Court denied that motion to dismiss. (Doc. 21).

receiving Graman's report (Count Three). (Doc. 22). The Second Amended Complaint also requests declaratory judgment as to the parties' rights and obligations under the policy (Count Two). (*Id.*).

In response, West Bend filed both an answer and a counterclaim. In its counterclaim, West Bend asks the Court to issue a declaratory judgment that the exclusions in the insurance policy preclude coverage for Winter's alleged damages. (Answer & Countercl., Doc. 27, #372–73). Moreover, West Bend's counterclaim alleges that Winter is not entitled to any coverage under the policy because it refused to make its representative, Scott Winter, available for an examination under oath by West Bend, thereby breaching the insured's contractual obligation to "cooperate with the investigation of the subject claim." (*Id.*).

On September 16, 2020, Winter filed a motion arguing that it is entitled to partial summary judgment on West Bend's counterclaim because Scott did not refuse to submit to an examination under oath. (Winter Mot. for Summ. J., Doc. 146). Rather, Winter says that Scott was willing to submit to an examination, but that Winter wanted West Bend to provide a copy of the policy first. (*Id.* at #8052). That same day, West Bend filed a cross-motion seeking summary judgment on its counterclaim. (West Bend Mot. for Summ. J. on Countercl., Doc. 148). In that motion, West Bend argues that Winter is not entitled to coverage under the policy because (1) the uncovered damages were due, at least in part, to surface water which is not a covered cause of loss under the policy; and (2) Winter forfeited coverage under the policy because it "intentionally concealed material documents related to the condition

of the subject building during the claims investigation and adjusting process." (*Id.* at #8129–30).

On that same day, West Bend also filed a motion seeking summary judgment on Winter's Second Amended Complaint. (West Bend Mot. for Summ. J. on Compl., Doc. 147). That motion addresses all of Winter's claims and shares many of the same arguments as West Bend's motion for summary judgment on its counterclaim. On the breach of contract front, West Bend again argues that it is not required to cover the damage because Winter concealed material documents and because the surface water exclusion precludes coverage. In this motion, however, West Bend additionally argues that Winter cannot establish contract damages.

West Bend also addresses Winter's bad faith claim, arguing both that Winter cannot establish that West Bend acted in bad faith and that Winter cannot establish damages that flow from the alleged bad faith conduct. The final piece of West Bend's motion concerns Winter's claim for declaratory judgment. Specifically, West Bend argues that declaratory judgment is not appropriate in this case because an injury has already occurred, and Winter's claim for damages is a better and more effective remedy.

On December 18, 2020, a few months after the parties' summary judgment motions, West Bend filed a motion to exclude Winter's expert witness on damages, Jay Fuhrmann, on the grounds that he did not use reliable methodology under *Daubert*. (Fuhrmann Mot., Doc. 160, #8533). In the alternative, West Bend argues

that the Court should exclude Fuhrmann's second report as an untimely rebuttal report. (*Id.* at #8535).

The three motions for summary judgment and the motion in limine have been fully briefed and are now ripe for review.

## SUMMARY JUDGMENT STANDARD

"The 'party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *See, e.g.*, *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). But the non-moving party cannot defeat a motion for summary judgment merely by pointing to *any* factual dispute. As the Sixth Circuit has explained, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (bracket omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

In other words, the factual dispute must be such that, if the jury were to credit the non-moving party's version of the facts on the disputed issue, a reasonable jury could conclude that a verdict in the non-moving party's favor is warranted. Put differently, "to defeat a motion for summary judgment, the 'evidence' must be 'such that a reasonable jury could return a verdict for the non-moving party.'" *Morehouse*

14

*v. Steak N Shake*, 938 F.3d 814, 818 (6th Cir. 2019) (quoting *Anderson*, 477 U.S. at 248). In short, "[t]he court must decide 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Int'l Outdoor, Inc.*, 974 F.3d at 697 (quoting *Anderson*, 477 U.S. at 251–52).

## LAW AND ANALYSIS

**A. The Court Grants West Bend Summary Judgment On Winter's Breach Of Contract And Bad Faith Claims.**

### 1. *The Court Grants West Bend Summary Judgment On Winter's Breach of Contract Claim Both As To The Wall Collapse Claim And The Roof Claim.*

To succeed on the breach of contract claim, Winter must show, by a preponderance of the evidence, that: (1) the insurance policy is valid; (2) Winter materially performed under the policy; (3) West Bend breached the policy; and (4) West Bend's breach damaged Winter. *See, e.g.*, *Liberty Ins. Corp. v. Anderson*, No. 1:16-cv-2249, 2017 WL 2962333, at \*3 (N.D. Ohio July 12, 2017) (applying Ohio breach of contract law when the contract at issue was an insurance policy).[5] West

---

[5] As this is a diversity matter, the Court applies Ohio's substantive law, including its choice of law provisions. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). In breach of contract cases, where, as here, a contract lacks a choice-of-law provision, (*see generally* Ins. Pol'y, Doc. 10-1), Ohio law provides that the court should apply the law of the State with the most significant relationship to the parties and the contract. *Ohayon v. Safeco Ins. Co. of Ill.*, 747 N.E.2d 206, 209 (Ohio 2001). And, in ascertaining which State that is, the Court "should consider the place of contracting, the place of negotiation, the place of performance, the location of the subject matter, and the domicile, residence, nationality, place of incorporation, and place of business of the parties." *Id.* (citing Restatement (Second) of Conflicts § 188(2)(a)–(d) (Am. L. Inst. 1971)).

Here, almost all of those factors point to Ohio law. While West Bend is a Wisconsin Corporation, the insurance policy at issue here was issued in Ohio to Winter Enterprises, an Ohio entity, and covered a structure located in Ohio. Therefore, Ohio has the most significant

Bend argues that the undisputed facts show that Winter cannot establish the last three elements, and therefore, West Bend is entitled to summary judgment on Winter's breach of contract claim. The Court finds that West Bend is correct that there is no issue of material fact as to whether West Bend breached its alleged obligation to cover the damages from the collapse of the south wall. The Court further concludes that West Bend is correct that Winter has not established damages to support its breach of contract claim with respect to the collapse of the roof. The Court thus **GRANTS** West Bend summary judgment on those grounds.

### a. The Surface Water Exclusion Precludes Coverage Of The Damage From The Collapse Of The South Wall.

Under Ohio law, "[i]t is well settled that an insurance policy is a contract and the relationship between the insured and the insurer is purely contractual in nature." *Myers v. Encompass Indemn. Co.*, 863 N.E.2d 1083, 1085 (Ohio Ct. App. 2006) (citing *Nationwide Mut. Ins. Co. v. Marsh*, 472 N.E.2d 1061 (Ohio 1984)). "It is [equally] well settled that insurance policies should be enforced in accordance with their terms as are other written contracts." *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 769 N.E.2d 835, 840 (Ohio 2002). Of course, "[i]n construing the terms of any contract, the principal objective is to determine the intention of the parties." *Hamilton Ins. Serv., Inc. v. Nationwide Ins.*, 714 N.E.2d 898, 900 (Ohio 1999) (citing *Aultman Hosp. Ass'n. v. Cmty. Mut. Ins. Co.*, 544 N.E.2d 920, 923 (Ohio 1989)). But courts "presume

---

relationship to this insurance contract. The Court accordingly applies Ohio law to this dispute. *See, e.g.*, *Basha v. Ghalib*, Nos. 07AP–963, 07AP–964, 2008 WL3199464, at *2 n.1 (Ohio Ct. App. Aug. 7, 2008) ("Under choice of law principles, Ohio law applies because the insurance policy was issued in Ohio to an Ohio entity.").

that the parties' intent is reflected in the language used." *Buehrer v. Meyers*, 155 N.E.3d 222, 226 (Ohio Ct. App. 2020). Accordingly, "[w]hen the policy language is clear, the court may look no further to find the intent of the parties." *Id.*

Here, West Bend argues that the plain language of the policy at issue—in particular, one exclusion in that policy called the surface water exclusion—shows that West Bend is entitled to summary judgment on all the damages resulting from the collapse of the south wall. The Court agrees.

Recall that the surface water exclusion provides that West Bend will not cover "loss or damage caused directly or indirectly by … surface water" "regardless of any other cause or event that contributes concurrently or in any sequence to the loss." (Ins. Pol'y, Doc. 10-1, #123–24). West Bend provided testimony from its expert, Patrick Slattery, that to a reasonable degree of engineering certainty, the south wall collapse "was caused by fast moving surface water carrying debris (i.e. flood waters) travelling in a north/northwesterly direction impacting the base of the wall." (Slattery Aff., Doc. 141-3, #7778).

To overcome summary judgment, then, it was incumbent upon Winter to create a genuine issue of material fact as to whether the surface water was the—or at least "a"—cause of the collapse. Winter failed to do so. Its own expert, Graman, admitted that the flowing water was a contributing cause—or at the very least, he could not reject Slattery's opinion to that effect. The Court's equivocation in characterizing Graman's opinion is necessary as his opinion on the topic has been a bit of a moving target. Originally, he opined that the collapse was the result of three factors—a tree

17

limb, water, and wind—all acting in conjunction, and that none of these factors alone would have sufficed to cause the collapse:

> Based on my analysis, any one factor alone likely could not have collapsed the south building wall. The entire south building wall is constructed of the same material. The collapse was likely caused by a combination of factors. During the storm, there was flowing water along the south wall of the building and some wind blowing on the wall. I believe the precipitating event that caused the wall to collapse at the location it did was the impact of the tree limb on the wall.

> Once the wall collapsed due to the combined flexural stresses created by the impact of the tree limb, the water, and the wind, the water entered the building and haphazardly scattered the individual CMU blocks and other debris across the floor of the building.

(Graman Aff., Doc. 57, #1231).

Nearly two years later, though, Graman filed an amended report in which, for the first time, he opined that the alleged tree limb impact, in and of itself, may have created sufficient impact force to collapse the wall, even without the forces created by the wind and the surface water. (Graman Report, Doc. 94-1, #4339). But then, when pressed on that topic at his deposition, Graman retracted that statement, at least to some extent:

> Q. So, you would agree with me that you cannot rule out that surface water was one of the factors that combined with other factors to cause the collapse of the wall. Correct?

> A. Correct.

(Graman Dep., Doc. 98-1, #4713; *see also id*. at #4813–14 ("Q: And you can't rule out that those combination of forces [the wind, the surface water, and the tree] was the actual cause of the fall of the wall. Correct? A: Correct.")).

At the end of the day, then, it comes down to this: West Bend's expert (Slattery) opines that the surface water was a necessary contributing force to the collapse (indeed, he opines that it is solely the water, accompanied perhaps by the wind), and Graman cannot rule out that surface water was a necessary contributing force to the incident. Graman's inability to rule out Slattery's opinion means that there is no genuine dispute between the parties as to whether the surface water played a necessary role in the collapse of the south wall. In essence, West Bend's expert says, "it definitely was the surface water running along the wall," and Winter's expert responds, "that could be the case." That does not suffice to create a genuine dispute of fact on this issue.

This lack of a genuine dispute as to whether the water played at least some role in the collapse poses a significant problem for Winter. That is because the policy excludes coverage so long as surface water is *a* cause, even if not *the* cause, of the loss. Perhaps that is why, in Winter's response to West Bend's motion for summary judgment, Winter largely takes a different tack. Rather than focusing on the role the water did, or did not, play, Winter instead principally argues that the water at issue here is not "surface water" within the meaning of the policy. That is so, Winter claims, because the water was directed through a French drain at the time it was flowing along the wall that collapsed. (Winter Opp'n to West Bend Mot. for Summ. J. on Compl., Doc. 154, #8459). And water in a French drain, Winter says, is not surface water under Ohio law.

West Bend offers two responses. First, it says that Winter has failed to create a genuine dispute as to whether a French drain even exists. According to West Bend, the only record evidence of a French drain is Winter's "self-serving" affidavit to that effect. This sole "self-serving" affidavit, West Bend continues, is not enough to carry Winter's claim past summary judgment. (West Bend Reply to Mot. for Summ. J., Doc. 157, #8499).

That argument does not work on the facts here. To be sure, in order for Winter's claims to survive summary judgment, "there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 251–52). But here, Winter submitted a sworn affidavit that, in 2014, Scott placed a French drain along the length of the south wall of the building to address water infiltration at that location. (Winter Aff., Doc. 152, #8233). That affidavit is "self-serving" in the sense that it is from a party (or at least the owner of a party) and supports that party's argument. But most parties submit evidence that supports their arguments, and here the person who allegedly installed the drain (and thus has first-hand knowledge about it) happens also to be the owner of the party in suit. That is not, in and of itself, a reason to reject the affidavit. Perhaps if other record evidence contradicted that affidavit, a different result would follow. But here, Exhibit Two attached to Scott's affidavit includes two pictures that appear to show the French drain at issue. (Doc. 152-3). A reasonable jury could find that these two pieces of evidence support the existence of the French drain. Thus, West Bend's argument fails on this front.

20

But West Bend is not done. Separately, West Bend argues that the water here, even when diverted by the French drain, still constitutes surface water within the meaning of the policy. As already noted, Ohio law controls the Court's resolution of interpretation and coverage issues. And, under Ohio law, surface water is "water from melted snow, falling rain, or rising springs, lying or flowing naturally on the earth's surface, not gathering into or forming any more definite body of water than a mere bog, swamp, slough, or marsh…. Surface water … is not of a substantial or permanent existence, has no banks, and follows no defined course or channel." *Front Row Theatre, Inc. v. Am. Mfr. Mut. Ins. Cos.*, 18 F.3d 1343, 1347 (6th Cir. 1994) (quoting *Heller v. Fire Ins. Exch.,* 800 P.2d 1006, 1008–09 (Colo. 1990)). But, key to Winter's argument, even water that starts as "surface water" loses its character as such if it evaporates or reaches "*some definite water-course* or substantial body of water in which [it is] accustomed to and do[es] flow with other waters." *Id.* (quoting *Fenmode v. Aetna Cas. & Surety Co.,* 6 N.W.2d 479, 481 (Mich. 1942)).

Winter relies on this latter principle to oppose West Bend's request for summary judgment. According to Winter, once the rain-water runoff was diverted by the French drain it was no longer surface water, as it was following a "definite water-course" (i.e., the path of the drain).

The Court disagrees. The Court instead holds that, under Ohio law, water temporarily diverted through a French drain still retains its character as surface water. The Court finds support for this holding in a number of Ohio cases that have

21

consistently found that water retains its status as surface water even when it is temporarily diverted through an underground pipe.

Take, for example, the First District Court of Appeals' opinion in *Reith v. McGill Smith Punshon, Inc.*, 840 N.E.2d 226 (Ohio Ct. App. 2005). There, a homeowner sued a developer when runoff from a new subdivision across the road damaged his property. The water in that case was rainwater that collected in a catch basin and was carried onto the homeowner's property through an underground pipe. While *Reith* turned on a statute of limitations issue, the appeals court had to decide whether the water was "sewer water" or "surface water." The Court ultimately determined that the water involved was surface water. Specifically, the *Reith* Court explained that "we are not persuaded that there is a legal distinction between surface water that is above the ground and surface water that is temporarily channeled through underground pipes." *Id.* at 231–32.

The Twelfth District Court of Appeals came to a similar conclusion in *Myers v. Encompass Indemnity Co.*, 863 N.E.2d 1083 (Ohio Ct. App. 2006). There, like here, an insurance dispute centered around a "surface water" exclusion. The insured "appeared to concede that the rain water dispersing on the ground was surface water, but argue[d] that it lost its character as surface water once it entered a well-defined channel, i.e., the drain basin and drain pipe." *Id.* at 1087. The *Myers* Court rejected that argument, explaining that "[w]e are persuaded by the Ohio cases … that the water in this case was surface water, which backed up from a drain, and flowed onto

appellee's property. Under the main provisions of this insurance policy, the loss caused by surface water is excluded." *Id.* at 1087–88.[6]

The Ninth District Court of Appeals provides yet another example in *Bonkoski v. Lorain County*, 115 N.E.3d 859 (Ohio Ct. App. 2018). The plaintiff in that case brought trespass claims, which a court analyzes under a particular legal standard if the trespass involves surface water. *Id.* at 865. In reaching its decision, the *Bonkoski* Court explained that "[s]urface water does not cease to be so merely because it percolates into the ground and is carried by underground conduits." *Id.* That principle ultimately informed the court's decision that the water in that case "did not lose its character as surface water when it percolated below ground, drained across the subsurface drainage tile, or reached the culvert from which it flowed toward a natural outlet." *Id.* at 866.

In all, the Court sees no reason why water potentially diverted through a French drain—which is basically a perforated pipe installed in an underground trench, with the trench then filled with loose stones or gravel and covered with earth—would be treated any differently under Ohio law than the various other types of drain pipes at issue in the above cases.[7]

Winter focuses most of its argument to the contrary on *Heller v. Fire Insurance Exchange*, 800 P.2d 1006 (Colo. 1990), a Colorado Supreme Court case

---

[6] Ultimately, the Court reversed the trial court's summary judgment holding for the insurance company because the insurance policy at issue in that case contained a provision, under the heading of "Additional Property Coverages," which covered losses from water "which backs up through sewers or drains."

[7] *French Drain,* Merriam-Webster Dictionary.com (2021), available at https:// www.merriam-webster.com/dictionary/French%20drain.

that the Sixth Circuit quoted when recounting the definition of surface water in
*Front Row Theatre*. The Court in *Heller* determined that snowmelt "runoff lost its
character as surface water when it was diverted by the trenches and therefore was
not within the surface water exclusion contained in the Hellers' policy." *Id.* at 1009.
Winter contends that the French drain here presents practically the same situation.
To the extent *Heller's* holding on that issue contradicts Ohio law, however, the Court
must defer to Ohio law, which governs this dispute. And, as demonstrated by the
above-cited Ohio cases, Ohio law provides that water diverted by an underground
pipe is surface water. *See also Emminger v. Bergman*, No. CA7772, 1982 WL 3901, at
*3 (Ohio Ct. App. Dec. 29, 1982) (describing rainwater and snowmelt as surface water
even though it was collected and delivered to the defendant's property through a 24-
inch pipe); *Aeh v. Madison Twp. Tr.*, No. 03CA2885, 2004 WL 912649 (Ohio Ct. App.
Apr. 23, 2004) (parties and court agreed that water was surface water where the
defendants constructed a culvert under a driveway that diverted rainwater onto the
plaintiff's property).

At bottom, there are two possible situations here. One possibility is that the
rainwater ran down the hill, struck the wall, and then drained along that wall, all
above ground, as Slattery, West Bend's engineer, suggests. In that case, the water is
surface water. The other possibility is that, as Winter argues, some of the water
percolated into the French drain after striking the wall, and flowed through that
drain along the wall. Under Ohio law, the water is surface water in either event.
Thus, the presence of the alleged French drain does not create a genuine issue as to

24

whether the surface water exclusion applies. The Court, therefore, **GRANTS** summary judgment to West Bend on Winter's breach of contract claim with respect to the damages from the collapse of the south wall.[8]

> ### b. Winter Did Not Show Damages To Support His Breach Of Contract Claim With Respect To Coverage For The Collapsed Roof.

Apart from the collapsed wall, Winter also argues that West Bend still owes $180,387.15 in unpaid coverage for the collapsed roof, in addition to the $158,055.93 that West Bend already paid on that loss. (Proofs of Loss, Doc. 145-7, #8042–43). At oral argument, Winter explained that this $180,387.15 discrepancy exists for two reasons. First, Winter claims that the $158,055.93 West Bend paid for the collapsed roof covers the actual cost value (ACV), but not the replacement cost value (RCV) which Winter claims is due under the policy. Second, Winter argues that the amount

---

[8] An additional reason leads largely, but not entirely, to the same result. Even if the tree limb itself created sufficient force to cause the wall to collapse, as Winter claims, the vast majority of the resulting *damage* arose from surface water flowing through the collapsed wall into the building. In that case, a covered loss (the tree limb) allowed an excluded form of loss (surface water) to cause damage. Some jurisdictions apply the "efficient proximate cause" doctrine in that situation. Under the doctrine of efficient proximate cause, "[i]f the cause which is determined to have set the chain of events in motion, the efficient proximate cause, is covered under the terms of the policy, the loss will likewise be covered." *Iroquois on the Beach, Inc. v. Gen. Star Indem. Co.*, 550 F.3d 585, 588 (6th Cir. 2008). But even assuming Ohio law applies the doctrine of efficient proximate cause as a default rule (an issue the Court does not reach), the parties here contracted out of its application by including anti-sequential and anti-concurrent cause clauses in the insurance policy. *Id.*; *see also Polk v. Landings of Walden Condo. Ass'n*, No. 2004-P-0075, 2005 WL 1862126, at *6 (Ohio Ct. App. Aug. 5, 2005).

Under the policy's plain language, then, the majority of the damage from the south wall collapse is excluded from coverage as "damage caused … by … surface water." (Ins. Pol'y, Doc. 10-1, #123–24). This is not a complete defense to coverage for the losses, though, as costs associated with fixing the wall itself (although not the resulting water damage in the interior) would be covered (although perhaps at ACV rather than RCV). Because the Court concludes that the surface water exclusion bars recovery for all losses associated with the wall's collapse, however, the Court need not attempt to parse out the amounts relating to water damage in the interior, as opposed to the costs associated with the collapse of the wall itself.

West Bend paid does not even cover the full ACV value of the damaged roof. The Court finds that Winter cannot establish damages under either argument.

Start with the RCV argument. In the insurance policy, West Bend agreed that "in the event of [covered] loss or damage … we will either (1) [p]ay the value of lost or damaged property; [or] (2) [p]ay the cost of repairing or replacing the lost or damaged property." (Ins. Pol'y, Doc. 10-1, #105). That said, a policyholder is not automatically entitled to the replacement cost. Rather, the policy specified that West Bend "will not pay on a replacement basis for any loss or damage … [u]ntil the lost or damaged property is actually repaired or replaced." (*Id.* at #109). Here, Winter never repaired the roof, which is a condition precedent to its entitlement to receive RCV under the policy. (Fuhrmann Dep., Doc. 140-1, #7490; Pls.' Resp. to Defs.' Statement of Undisputed Facts, Doc. 154-1, #8482 ("Plaintiff admits only that it sold the subject property, and did not, and will not, be making any repairs to the subject property.")). The policy language thus suggests that Winter is not entitled to RCV damages for the roof.

Winter tries to avoid that result by explaining that it wanted to repair the roof but could not afford to do so given West Bend's decision to deny coverage of the extensive storm damage. This argument seeks to invoke the well-established rule that "[o]ne cannot avoid liability by preventing the performance of a condition precedent." *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 879 (6th Cir. 2007) (recounting jury instructions). And Winter is correct that this principle means that West Bend cannot at the same time both (1) make it impossible for Winter to make repairs to the

26

building, while also (2) seeking to take advantage of Winter's failure to do so. *See Dabaja v. State Farm Fire & Cas. Co.*, No. 14-13222, 2016 WL 1022968, at *3 (E.D. Mich. Mar. 16, 2016) (applying Michigan law).

While this argument works in theory, it fails on the facts here. That is because Winter cannot show that West Bend inappropriately prevented Winter from repairing the roof. The only reason Winter would repair the warehouse roof would have been if Winter intended to continue operating the facility. But Winter admitted at oral argument that, if West Bend was not required to cover the entirety of the storm damage (most of which was associated with water damage that followed from the south wall collapse), Winter could not afford to repair the building. As noted above, however, West Bend properly denied coverage for loss resulting from the south wall collapse. That means that Winter essentially has conceded that it would not have repaired the warehouse roof. Therefore, Winter is not entitled to RCV based on this equitable argument, either.

Separately, Winter argues that West Bend did not pay the full ACV value due under the policy. In Ohio, actual cash value is established by one of two methods: "market value of the property at the time of loss, or the cost of repairs minus depreciation, if any." *Asmaro v. Jefferson Ins. Co. of New York,* 574 N.E.2d 1118, 1122 (Ohio Ct. App. 1989).

As for the first method, Winter argues that West Bend's appraisal expert established ACV when he opined that the pre-event value of the property was $800,000 and the post-event value of the property was $240,000. (Winter Opp'n to

West Bend Mot. for Summ. J. on Compl., Doc. 154, #8460–61 (citing Moye Expert Report, Doc. 141-1, #7685)). These figures, however, represent the ACV of *all* the damaged property, including the collapsed south wall. As West Bend is not obligated to cover losses associated with the collapse of the south wall, the relevant damages here are limited only to the ACV of the collapsed roof. West Bend's appraisal expert does not purport to estimate that value.

As for the second method, Winter points to no evidence in the record that shows the "cost of repairs minus depreciation." *Id.* Winter acknowledges that West Bend paid $158,055.93 in ACV for the damage to the roof, but argues that this figure was less than the ACV of the damaged roof. (Lanier Dep. 2, Doc. 143-1, #7936; Claim Activity Log, Doc. 90-6, #2759; *see also* Lanier Dep. 1, Doc. 90-1, #2609).[9] That is all well and good, but Winter needs evidence as to the amount of the alleged discrepancy, and, so far as the Court can tell, it has provided none.

At oral argument on the motions, Winter's counsel suggested that Mark Jacoby, Winter's public adjuster, explained the basis for a higher ACV in his deposition testimony. But counsel declined to provide a page citation for that claim, and the Court has been unable to locate the alleged testimony. The closest the Court can come is an exchange at the deposition where West Bend's counsel asked Jacoby to list the "total amount of damages to the building that [he] believe[d] West Bend should still be responsible to pay for." (Jacoby Dep., Doc. 68-1, #2082). Jacoby

---

[9] Cathy Lanier, West Bend's insurance agent, stated that she thought paying for the roof was a "good coverage decision" and West Bend maintained at oral argument that it does not seek reimbursement of those funds. (Lanier Dep. 1, Doc. 90-1, #2669).

responded that "there was an additional discrepancy on the roof coverage for the warehouse which was approximately 110,000 if I recall. The difference between 17,050 square feet versus just shy of … 1,700 [square feet]…. So there was almost a tenfold difference in the estimate for the warehouse." In other words, Jacoby appears to suggest that West Bend did not fully cover the damaged area of the roof.[10] Winter, however, never translates the "uncovered" portions of the roof repair into an ACV damages figure.

The proof of loss in the record claims $180,387.15 in unpaid damages for the collapse of the roof. (Proofs of Loss, Doc. 145-7, #8042–43). But Winter's counsel conceded at oral argument that the majority of that damages figure consists of the difference between the RCV and ACV of the roof. When asked what portion of the roughly $180,000 reflects the allegedly underpaid ACV, counsel had no answer, and could not point the Court to any record evidence that would provide one.

In an effort to be thorough, the Court also reviewed the deposition transcript from Winter's expert witness on damages, Jay Fuhrmann. But perhaps not surprisingly (as Winter's counsel did not suggest that the information would be there) that transcript does not offer much help on this issue. At his deposition, Fuhrmann explained that his report provides an estimate of only RCV damages, not an estimate of ACV damages. (Fuhrmann Dep., Doc. 140-1, #7492 (Q. So you don't have an opinion as to actual cash value, correct? A. No, not right now.)). Fuhrmann further explained

---

[10] In the Claim Activity Notes, Cathy Lanier (West Bend's Claim Representative) recorded part of an email from Jacoby where Jacoby explained his belief that "[w]ater infiltration under the roof membrane has migrated …and [could] compromise the integrity of the membrane." (Claim Activity Log, Doc. 90-6, #2757).

that he did not depreciate the cost of any repairs, which is required to establish an ACV, because Winter did not ask him to perform an ACV analysis. (*Id.* (Q. Well, as I look through your estimate, you didn't take depreciation on anything? A. I did not because I wasn't asked to. I was asked to come up with a value of the loss. I wasn't asked to depreciate it. Q. Right. And if you don't take depreciation, it's impossible to come up with an opinion of actual cash value, correct? A. Correct.)).

In short, Winter fails to point to any evidence in the record on an issue— damages associated with the alleged failure to pay the full ACV amount that was due—as to which it bears the burden of proof. Thus, West Bend is entitled to summary judgment on this issue.

### 2. *The Court Grants West Bend Summary Judgment On Winter's Bad Faith Claim Because Winter Has Not Submitted Evidence Of Damages That Flow From West Bend's Alleged Bad Faith Conduct.*[11]

Ohio law imposes a duty on insurance companies to act in good faith when handling an insured's claim. *Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, 1319 (Ohio 1983). An insurance company acts in bad faith when it denies a claim without reasonable justification to support that decision. *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 400 (Ohio 1994). Winter alleges that West Bend violated that its duty of

---

[11] The Court analyzes Winter's bad faith claim even though it grants summary judgment on Winter's breach of contract claims because "a cause of action for the tort of bad faith may exist irrespective of any liability arising from a breach of contract." *Bullet Trucking, Inc. v. Glen Falls Ins. Co.*, 616 N.E.2d 1123, 1126 (Ohio Ct. App. 1992); *See also Gerken v. State Auto Ins. Co. of Ohio*, 20 N.E.3d 1031, 1044 (Ohio Ct. App. 2014) (citing cases); *Broad v. N. Pointe Ins. Co.*, No. 5:11CV2422, 2014 WL 1097925, at *19 (N.D. Ohio Mar. 19, 2014) ("It is possible to maintain a bad faith claim in the absence of a breach of the contractual obligations flowing from the policy.").

good faith because it "denied" Winter's claim within two days of the storm incident, which, according to Winter, is before West Bend had enough information to reasonably adjudicate Winter's claim. Winter submits the expert testimony of its bad faith expert, Tom Bruns, who opines that the period of bad faith lasted from August 30, 2016, (i.e., the day West Bend "prematurely" denied the claim), through October 5, 2016, (i.e., the day on which West Bend issued a denial based on Slattery's engineering inspection). (Tom Bruns Dep., Doc. 138-1, #7389).

West Bend disagrees. First, West Bend claims that it did have "reasonable justification" to support its insurance decision. Regardless, West Bend argues that it is entitled to summary judgment because Winter cannot establish damages to support its bad faith claim. The Court agrees with West Bend on the latter point— and so does not address whether West Bend had a "reasonable justification" for its coverage decisions.

"A bad faith claim, if proven, allows for recovery of extracontractual damages. These are damages over and above those covered by the insurance contract sustained by the insured as a consequence of the insurer's bad faith." *LeForge v. Nationwide Mut. Fire Ins. Co.*, 612 N.E.2d 1318, 1323–24 (Ohio Ct. App. 1992) (citing *Asmaro*, 574 N.E.2d at 1123); *see also Ohio Nat'l Life Assurance Corp. v. Satterfield*, 956 N.E.2d 866, 878 (Ohio Ct. App. 2011) (Belfance, J., concurring in part and dissenting in part).

31

Winter submits that it is entitled to two forms of extracontractual damages on the facts here: punitive damages and attorneys' fees.[12] Start with punitive damages. As an insurance bad faith claim is a tort, "punitive damages may be recovered against an insurer who breaches his duty of good faith in refusing to pay a claim of its insured upon adequate proof." *Hoskins*, 452 N.E.2d at 1320. These extraordinary damages are warranted, however, only upon a showing of "[a]ctual malice." *Id.* (quoting *Columbus Finance, Inc. v. Howard*, 327 N.E.2d 654, 658 (Ohio 1975)). Ohio courts have held that actual malice exists either when the defendant acts with "ill will, hatred or spirit of revenge," or performs such "reckless, wanton, wilful [sic] and gross acts" that the court can "infer[] malice from [that] conduct and [the] surrounding circumstances." *Id.*

Winter tries to meet the actual malice standard by arguing that Cathy Lanier acted recklessly when she "denied" the claim within two days of the storm event. That doesn't work. To start, it is not entirely clear that West Bend actually denied coverage on August 30, 2016, as Winter claims. On August 29, 2016, West Bend's adjuster, Mike Fannon, walked the property, and then told Lanier that much of the damage was due to surface water, which is excluded under the policy (Claim Activity Log, Doc. 90-6, #2754). In accordance with Fannon's findings, Lanier advised Winter on August 30, 2016, that the "majority of water damage is from the surface water and this is not covered." (*Id.*). Winter maintains that Lanier's hasty coverage

---

[12] At oral argument, Winter also explained that the denial of his insurance claim has been a source of considerable stress for Scott Winter and his family. Later, however, Winter clarified that it was not putting forward a claim for emotional distress damages.

determination indicates that she did not consider the evidence, but instead had her "mind made up" to deny coverage. (Jacoby email, Doc. 90-9, #2808). During Lanier's deposition however, Lanier repeatedly said that she did not deny the claim on August 30, 2016. Rather, Lanier claims she was just alerting Winter to the possibility that the water damage might not be a covered claim, but was reserving the actual coverage decision until the investigation was complete. (Lanier Dep., Doc. 90-1, #2646, 2652).

Separately, even if Lanier did deny aspects of Winter's claim on August 30, 2016, there is nothing about that denial that rises to the level of "actual malice" on the record here. While a hasty denial may give rise to the tort of bad faith in certain circumstances, *see Ullman v. Auto-Owners Mut. Ins. Co.*, 502 F. Supp. 2d 737 (S.D. Ohio 2007), "[s]omething more than the mere commission of a tort is always required for punitive damages." *Asmaro*, 574 N.E.2d at 1126 (quoting *Detling v. Chockley*, 436 N.E.2d 208, 211 (Ohio 1982)[13]). In other words, bad faith alone is not enough to establish a right to punitive damages. Rather, as noted above, as with any other tort, to obtain punitive damages, Winter must show actual malice. And here, the

---

[13] The Ohio Supreme Court overruled *Detling*'s determination as to how the punitive damages standard applied in that particular case. Specifically, the Court explained in *Cabe v. Lunich*, 640 N.E.2d 159, 162–63 (Ohio 1994) that:

> We today overrule *Detling* to the extent that it precludes introduction of evidence of voluntary alcohol consumption of a defendant driver in the punitive damages phase of a civil trial. We are convinced that the conduct of drinking and driving may well, under the circumstances of each individual case, constitute the kind of reckless, outrageous behavior justifying a jury to conclude that the defendant possessed a willful indifference to the rights and safety of others justifying an award of punitive damages. We hold that evidence that a negligent driver had consumed alcohol prior to a vehicular accident is relevant and admissible to establish whether the driver can be deemed to have acted with actual malice justifying the award of punitive damages.

undisputed facts show that Lanier partially "denied" Winter's claim based on her belief (and Fannon's belief) that most of the damage was due to surface water. This determination (which ultimately proved correct) does not reflect hatred or ill will, nor was it so reckless as to allow the Court to infer actual malice. *Cabe v. Lunich*, 640 N.E.2d 159, 162–63 (Ohio 1994) (quoting *Preston v. Murty*, 512 N.E.2d 1174, 1176 (Ohio 1987)). Therefore, Winter is not entitled to punitive damages on its bad faith claim.

That fact also dooms Winter's claim for attorneys' fees. That is because attorneys' fees are available "as an element of compensatory damages where the jury finds that punitive damages are warranted." *Zoppo*, 644 N.E.2d at 402 (quoting *Columbus Finance, Inc.*, 327 N.E.2d at 658). As punitive damages are not an available remedy here, attorneys' fees are not available, either.

As Winter has not presented any evidence demonstrating that it suffered damages as a result of West Bend's alleged bad faith conduct, the Court must **GRANT** West Bend's Motion for Summary Judgment on Winter's Bad Faith Claim.

## CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART** West Bend's Motion for Summary Judgment on Winter's Second Amended Complaint (Doc. 147). In particular, the Court finds that Defendant is entitled to judgment as a matter of law on Winter's breach of contract claim (Count One) and bad faith claim (Count Three). The Court therefore **DENIES** that same Motion **AS MOOT** to the extent that it seeks summary judgment on Winter's declaratory judgment claim (Count

34

Two). The Court also **DENIES AS MOOT** Winter's Motion for Partial Summary Judgment on West Bend's Counterclaim (Doc. 146), West Bend's Cross-Motion for Summary Judgment on that same counterclaim (Doc. 148), and West Bend's Motion to Exclude Fuhrmann (Doc. 160). The Court directs the Clerk to enter judgment accordingly and to **TERMINATE** this case on the Court's docket.

      **SO ORDERED.**

September 15, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**